Christopher Sproul (State Bar No. 126398)
Brian Orion (State Bar No. 239460)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email:  csproul@enviroadvocates.com
Email:  borion@enviroadvocates.com

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, <br><br> Plaintiff, <br><br> v. <br><br> PICK-YOUR-PART AUTO WRECKING, <br><br> Defendant. | Civil Case No. <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et. seq.) |

Los Angeles Waterkeeper, by and through its counsel, hereby alleges:

## I.     JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. section 1251 *et seq*. (the "CWA"). This Court has subject matter jurisdiction over the claims in this action pursuant to CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. section 1331 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On November 11, 2021, Los Angeles Waterkeeper provided notice of violations of the CWA by Defendant Pick-Your-Part Auto Wrecking, a California

corporation with offices at 500 West Madison Street, Suite 2800, Chicago, IL 60661 (hereinafter "Defendant" or "LKQ"), and of Los Angeles Waterkeeper's intention to file suit against LKQ, to: LKQ; LKQ Corporation, with offices at 500 West Madison Street, Suite 2800, Chicago, IL 60661 ("LKQ Corporation"); the Administrator of the United States Environmental Protection Agency ("EPA"); the Acting Regional Administrator of EPA Region IX; the Executive Director of the California State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Region 4 ("Regional Board"); and the U.S. Attorney General ("Notice Letter") as required by the CWA, 33 U.S.C. § 1365(b)(1)(A).

3.     More than sixty days have passed since notice was sent to LKQ and the state and federal agencies. Neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to CWA section 505(c)(1), 33 U.S.C. §1365(c)(1), because the sources of the violations are located within this judicial district.

## II.     INTRODUCTION

5.     This complaint seeks relief for unlawful discharges of pollutants from LKQ's facilities located at 1232 Blinn Avenue, Wilmington, California 90744 ("the Wilmington Facility") and 9128 and 9228 Tujunga Avenue, Sun Valley, California 91352 ("Sun Valley Facility" and collectively with the Wilmington Facility, the "Facilities") into waters of the United States in violation of the CWA and the State of California's National Pollution Discharge Elimination System ("NPDES") General Permit for Storm Water Discharges Associated With Industrial Activities,

Order NPDES No. CAS000001, California State Water Resources Control Board Water Quality Order 2014-0057-DWQ, as amended in 2015 and 2018 (Order 2015-0122-DWQ and November 6, 2018 Board Amended Requirements) ("General Permit").

6.      Violations of the CWA and the General Permit by small industrial sites are recognized as a leading cause of significant, cumulative impacts to the water quality of the Dominguez Channel, the Tujunga Wash, the Los Angeles River, the Los Angeles Harbor, San Pedro Bay, and the Pacific Ocean. With every rainfall event, hundreds of millions of gallons of polluted rainwater flow off of local industrial facilities, such as LKQ's, and pour into storm drains and into Dominguez Channel, the Tujunga Wash, the Los Angeles River, the Los Angeles Harbor, San Pedro Bay, and the Pacific Ocean. The consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering the aquatic environment each year.

7.      Stormwater runs off of industrial sites such as LKQ's, causing harm to humans and aquatic life. In particular, stormwater from such industrial facilities contains suspended sediment and heavy metals such as aluminum, iron, copper, and zinc. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological and reproductive effects. Fish are widely used to evaluate the health of aquatic systems because pollutants accumulate in fish, which are an important part of aquatic food chains. Heavy metals have been shown to alter physiological activity in tissues and blood of fish.

8.      In addition, high concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have been shown to alter predator-prey relationships (for example turbid water can make it difficult for fish to see their

prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments.

9.      LKQ's stormwater discharges contribute to the ongoing stormwater pollution problem and exemplify the epidemic of violations of the General Permit that Los Angeles Waterkeeper is seeking to eliminate or reduce. These pollution discharges can and must be curtailed for the rivers and water bodies of Los Angeles to be restored to ecological health.

## III.   **PARTIES**

10.      Los Angeles Waterkeeper is a 501(c)(3) public benefit corporation, organized and existing under the laws of the State of California with a principal office at 120 Broadway, Suite 105, Santa Monica, California 90401. Los Angeles Waterkeeper was founded in 1993 with the mission of preserving, protecting, and defending the inland and coast waters of Los Angeles County from all sources of pollution and degradation.  In pursuit of this mission, Los Angeles Waterkeeper actively seeks federal and state implementation of the CWA, and where necessary, initiates enforcement actions under the CWA on behalf of itself and its members. Members of Los Angeles Waterkeeper (including citizens, taxpayers, property owners, and residents) live, work, travel, recreate, own property and homes and reside in Los Angeles County. They use and enjoy the waters into which LKQ causes pollutants to be discharged, including the Dominguez Channel, the Tujunga Wash, the Los Angeles River, other Los Angeles County waterways, and the ocean and beaches into which those waters flow, including the Los Angeles Harbor, San Pedro Bay, and the Pacific Ocean. Members of Los Angeles Waterkeeper use these

waterways for recreational, educational, aesthetic, and spiritual purposes. Additionally, Los Angeles Waterkeeper and its members use these waters to engage in scientific study through pollution and habitat monitoring and conservation activities. LKQ's alleged discharge of stormwater containing pollutants impairs each of those uses. Moreover, Los Angeles Waterkeeper's members regularly review and use the reports, data, and other information uploaded to the State Board's Stormwater Multiple Application and Reporting System ("SMARTS") database by industrial dischargers as part of General Permit compliance, including by LKQ, for various purposes, including research, monitoring, program development, and policy advocacy. These interests are harmed by the inadequate and inaccurate reports submitted by LKQ as described herein. Thus, the interests of Los Angeles Waterkeeper's members have been, are being, and will continue to be adversely affected by the degradation of the affected waterways, and inaccurate and inadequate monitoring and reporting practices, resulting from LKQ's failure to comply with the General Permit and the CWA.

11.     Plaintiff is informed and believes that LKQ is a California corporation and is a wholly owned subsidiary of LKQ Corporation.

**A.      The Wilmington Facility**

12.     LKQ owns and operates the Wilmington Facility. As noted, the address for the Facility is 1232 Blinn Avenue, Wilmington, California 90744. The Wilmington Facility discharges via municipal storm sewer to the Dominguez Channel.

13.     At the Wilmington Facility, LKQ conducts automotive dismantling (including the draining of automotive fluids and crushing of vehicles), vehicle washing, and storage of automotive parts for both retail and scrap. These operations fall within Standard Industrial Classification code ("SIC Code") 5015 (Motor

Vehicle Parts, Used). LKQ's industrial operations at the Wilmington Facility involve the use of a number of materials that are potential sources of pollutants in its storm water runoff, including used motor oil, brake fluid (mixed with used motor oil), used and virgin gasoline, virgin oils and hazardous materials (including but not limited to, diesel fuel and other oils and grease), used antifreeze, used battery acid, oil containing rags and absorbents, used oil filters, paints, detergents, lubricants and solvents, and mercury switches. In addition, LKQ generates dust and particulates from the loading and unloading of vehicles and parts at the Wilmington Facility. The Wilmington Facility includes several industrial areas, material handling and storage areas, dust and particulate generating activities, and spills or leaks that may be exposed to storm water discharges. The Wilmington Facility lacks sufficient and/or sufficiently well-maintained berms or other structural controls to retain stormwater onsite. LKQ does not sufficiently treat contaminated stormwater prior to discharge from the Wilmington Facility. LKQ's annual reports and ad-hoc reports filed with the Regional Board indicate that discharges of stormwater from the Wilmington Facility are consistently contaminated with higher levels of pollutants than permissible under the General Permit and that LKQ has consistently failed to comply with numerous requirements of the General Permit, including but not limited to, making Exceedance Response Action ("ERA") filings in compliance with specific requirements, developing and implementing adequate Best Management Practices ("BMPs"), revising and updating its Stormwater Pollution Prevention Plans ("SWPPPs"), developing an adequate monitoring implementation plan, conducting the requisite storm water sampling, and other activities noted below.

## B.    The Sun Valley Facility

14.    LKQ owns and operates the Sun Valley Facility located at 9128 and 9228 Tujunga Avenue, Sun Valley, California 91352.

Case No.                                    Page 5                                    Complaint

15.     At the Sun Valley Facility, LKQ conducts automotive dismantling (including the draining of automotive fluids and crushing of vehicles), vehicle washing, and storage of automotive parts for both retail and scrap. These operations fall within SIC Code 5015 (Motor Vehicle Parts, Used). The industrial operations that LKQ conducts at the Sun Valley Facility involve the use of a number of materials that are potential sources of pollutants in its storm water runoff, including used motor oil, used brake fluid, used and virgin gasoline, virgin oils and hazardous materials (including but not limited to, used and virgin diesel fuel and other oils and grease), used antifreeze, used batteries and battery acid, oil containing absorbents and debris, transmission fluid, hydraulic tractor fluid, used oil filters, latex paints, aerosols, detergents, lubricants and solvents, and mercury switches. In addition, LKQ generates dust and particulates from the loading and unloading of vehicles and parts at the Sun Valley Facility, and from weather-related impacts to the Sun Valley Facility. The Sun Valley Facility includes several industrial areas, material handling and storage areas, dust and particulate generating activities, and spills or leaks that may be exposed to storm water discharges. The Sun Valley Facility lacks sufficient and/or sufficiently well-maintained berms or other structural controls to retain stormwater onsite. LKQ does not sufficiently treat contaminated stormwater prior to discharge from the Sun Valley Facility. LKQ's annual reports and ad-hoc reports filed with the Regional Board indicate that discharges of stormwater from the Sun Valley Facility are consistently contaminated with higher levels of pollutants than permissible under the General Permit and that LKQ has consistently failed to comply with numerous requirements of the General Permit, including but not limited to, making Exceedance Response Action filings in compliance with specific requirements, developing and implementing adequate BMPs, revising and updating SWPPPs, developing an adequate monitoring implementation plan, conducting the

requisite storm water sampling, and other activities noted below.

### C.   Affected Receiving Waters

#### 1.   The Wilmington Facility

16.   Stormwater discharged from the Wilmington Facility flows into the Los Angeles County municipal separate storm sewer system ("MS4"), into the Dominguez Channel, into Los Angeles Harbor, into San Pedro Bay, and into the Pacific Ocean.

17.   The Dominguez Channel Estuary, the Los Angeles Harbor, and San Pedro Bay provide habitat for numerous species, including many that are endangered, threatened, rare, and endemic to Southern California. The Dominguez Channel Estuary provides a rich brackish habitat at the intersection of freshwater and saltwater environments. From Vermont Street downstream to Los Angeles Inner Harbor, Dominguez Channel has a soft bottom with riprap banks, and is estuarine. The Los Angeles Harbor includes extensive soft bottom areas and eelgrass beds, and the outer harbor supports some kelp habitat. Over 100 species of birds occupy habitats in the Port of Los Angeles and Port of Long Beach including three species that are listed as threatened or endangered by either the State or federal government (California least tern, Western Snowy Plover, and Peregrine Falcon). At least 18 bird species nest in the Los Angeles – Long Beach Port area. Birds that use Inner Cabrillo Beach include gulls and pigeons as well as seasonal snowy plovers, Caspian terns, least terns, black skimmers, Forster's terns, brown pelicans, great blue herons, sanderlings, western and least sandpipers, willets western, Clark's, and eared grebes, cormorants, occasional loons and ducks. Over 70 species of fish, and over 400 species of invertebrates, have been noted in the Los Angeles Harbor. The fish population of both inner and outer harbors was estimated at 44 million in 2000, which establishes this area as a significant marine fishery resource. In addition, California sea lions, harbor seals, elephant seals,

dolphins and gray whale calves all use the Los Angeles Harbor for various parts of their life stages. These habitats remain vulnerable, however. Past habitat destruction and pollution have led to the extirpation of many species.

18.    The Regional Board's Basin Plan seeks to protect and maintain aquatic ecosystems and the resources those systems provide to society. The Basin Plan acknowledges discharges of urban industrial site stormwater as a potential significant source of pollution adversely affecting the quality of local waters. Contaminated stormwater discharges from the Facilities adversely impact the water quality of the Dominguez Channel, Los Angeles Harbor, the Pacific Ocean, and nearby beaches, estuaries, waterways, and other coastal areas, and threaten the vulnerable and important ecosystems in these areas. Dominguez Channel and Los Angeles Harbor sediments act as a sink for bioaccumulative deposits of heavy metals, and strong winds and tidal currents continually re-suspend and redeposit these metals. Toxic chemicals are concentrated in the Dominguez Channel and Los Angeles Harbor's food web as toxic metals and other contaminants. These contaminants are absorbed and consumed by organisms lower on the food chain and then travel up the food chain, to be consumed by shellfish, fish, birds and eventually by humans. Contamination of the aquatic food chain disproportionately harms minority and poor communities, who typically eat a greater than average amount of fish.

19.    Stormwater runoff from the Facilities contaminated with metals and other pollutants also harms the special aesthetic and recreational significance that the Dominguez Channel and Los Angeles Harbor and their tributaries have for people in the surrounding communities. Pollution and contamination from LKQ's Facilities harms the aesthetic, educational and recreational experiences of Los Angeles Waterkeeper's members who use the affected waters.

### 2.    The Sun Valley Facility

20.     Stormwater discharged from the Sun Valley Facility flows to the Tujunga Wash, to the Los Angeles River, and to the Pacific Ocean.

21.     The Tujunga Wash is a tributary of the Los Angeles River, Reach 3. LA River Reaches 1-3 provide critical habitat for species, including many that are endangered, threatened, rare, and endemic to Southern California. The concrete-lined sections provide wading habitat for shorebirds that cannot live elsewhere given that the majority of Los Angeles's wetlands have been destroyed. The Los Angeles River estuary provides a rich brackish habitat at the intersection of freshwater and saltwater environments. The LA River supports endangered species, including the Least bell's vireo, Western yellow-billed cuckoo, Willow flycatcher, and Tri-colored blackbird. It also supports species of special concern, such as the Santa Ana sucker, arroyo chub, California brown pelican, yellow-breasted chat, long-billed curlew, bank swallow, and the California red-legged frog. These habitats remain vulnerable, however. Past habitat destruction and pollution have led to the extirpation of many species, including the western pond turtle and the steelhead trout, and many species listed here are likely to be extirpated in the near future.

22.     The Basin Plan acknowledges discharges of urban industrial site stormwater as a potential significant source of pollution adversely affecting the quality of local waters. Contaminated stormwater discharges from the Sun Valley Facility adversely impacts the water quality of the Tujunga Wash, the Los Angeles River, the Pacific Ocean, and nearby beaches, estuaries, waterways, and other coastal areas, and threaten the vulnerable and important ecosystems in these areas. Contaminated stormwater from automotive vehicle disassembly, storage, and used parts and scrap sales, and associated activities at the Facilities endangers rare and endangered species and further degrades habitat for all species in the Tujunga Wash, the Los Angeles River, the Pacific Ocean. Tujunga Wash and Los Angeles

River sediments act as a sink for bioaccumulative deposits of heavy metals, and strong winds and tidal currents continually re-suspend and redeposit these metals. Toxic chemicals are concentrated in the Tujunga Wash and Los Angeles River's food web as toxic metals and other contaminants. These contaminants are absorbed and consumed by organisms lower on the food chain and then travel up the food chain, to be consumed by shellfish, fish, birds and eventually by humans. Contamination of the aquatic food chain disproportionately harms minority and poor communities, who typically eat a greater than average amount of fish.

23. Stormwater runoff from the Sun Valley Facility contaminated with metals and other pollutants also harms the special aesthetic and recreational significance that the Tujunga Wash, the Los Angeles River and its tributaries has for people in the surrounding communities. Pollution and contamination from Sun Valley Facility harms the aesthetic, educational and recreational experiences of Los Angeles Waterkeeper's members who use the affected waters.

## IV. LEGAL BACKGROUND

### A. Clean Water Act

24. CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

25. CWA section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved permit program for discharges. In California, the State Board has approval from EPA to administer an NPDES permit program for the state. The CWA and its implementing regulations require any person who discharges or proposes to discharge pollutants into waters of the United States in California to submit an NPDES permit application to the State Board. 40 C.F.R. §§ 122.21(a),

122.26(a)(ii); 33 U.S.C. § 1342(p)(2)(B). The State Board and its nine Regional Boards issue individual and general NPDES permits regulating discharges from various categories of dischargers. As relevant here, in 2015, the State Board adopted the General Permit effective July 1, 2015, and amended it in 2018.[1]

26.     CWA section 402(p), 33 U.S.C. § 1342(p) modifies the regulation of discharge of pollutants in storm water, providing that not all storm water discharges are subject to CWA NPDES regulation. Relevant here, CWA section 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B), mandates that storm water discharges water from "industrial activity" is NPDES regulated. EPA has promulgated a regulation, 40 C.F.R. § 122.26(b)(14), defining "industrial activity" to mean activity that falls within specified SIC Codes. As relevant here, these include SIC Code 5015 (Motor Vehicle Parts, Used). *See* 40 C.F.R. § 122.26(b)(14)(vi).

27.     In accordance with its authority under CWA section 402(p), the State Board issued the General Permit to regulate the discharge of pollutants in storm water "associated with industrial activities." 33 U.S.C. § 1342(p)(2)(B); General Permit § II.B.1.a. Like EPA's regulation, 40 C.F.R. § 122.26(b)(14), the General Permit uses the SIC Code system to define the types of activities that are subject to General Permit coverage. In particular, Attachment A to the General Permit sets forth nine categories of activities considered to be "industrial activity." As relevant here, these include SIC Code 5015. General Permit, Attachment A § 6.

28.     CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of

---

[1] A copy of the General Permit is available from the State Board's website at https://www.waterboards.ca.gov/water_issues/programs/stormwater/igp_20140057d wq.html

1  pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

2  29.    CWA section 505(a) authorizes a citizen suit action for injunctive

3  relief. 33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil

4  penalties of up to $56,460 per day per violation for violations occurring after

5  November 2, 2015 and assessed on or after December 23, 2020. 33 U.S.C. §

6  1319(d); 40 C.F.R. § 19.4 (EPA regulation adjusting the CWA's statutory civil

7  penalties for inflation).

8      **B.    State Regulations**

9  30.    The Los Angeles River is heavily degraded from pollutant loading.

10  This is officially recognized by the EPA, the State Board and the Regional Board,

11  which have placed the receiving waters for discharges from the Facilities (including

12  the Dominguez Channel Estuary, Tujunga Wash, Los Angeles River, and Los

13  Angeles Harbor) on the CWA section 303(d) list of waters that are so polluted that

14  they do not meet applicable water quality standards. The Basin Plan is the master

15  policy document setting forth the legal, technical, and programmatic bases of water

16  quality regulation in the Region. Among other things, the Basin Plan includes the

17  water quality objectives needed to protect the designated beneficial water uses. The

18  Basin Plan sets forth narrative water quality objectives for sediment, settable matter,

19  and suspended materials, as well as narrative objectives for not impairing water

20  quality with oil sheens, turbidity, or other nuisance conditions. The Basin Plan also

21  includes numeric water quality standards for pH, dissolved oxygen and toxic

22  pollutants as well as site specific objectives for certain pollutants of concern such as

23  copper, lead, and zinc.

24  31.    In addition, a rule promulgated by EPA known as the California

25  Toxics Rule ("CTR"), 40 C.F.R. § 131.38, sets Water Quality Standards for 126

26  toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries.

27

28

The CTR includes limits for several toxic metals.

## C.     The General Permit

32.     In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity. The General Permit is an NPDES permit pursuant to CWA section 402(p), 33 U.S.C. § 1342(p), the current version of which took effect on July 1, 2015, and it was amended in 2018. To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the General Permit and comply with its terms or obtain and comply with an individual NPDES permit.

33.     It is unlawful to discharge pollutants to waters of the United States, such as the Dominguez Channel, the Tujunga Wash, the Los Angeles River, the Los Angeles Harbor, San Pedro Bay, and the Pacific Ocean, without an NPDES permit or in violation of the terms and conditions of an NPDES permit.

34.     The Wilmington Facility has been enrolled under the General Permit since at least April 7, 1992, and LKQ has been a permittee under the General Permit for the Wilmington Facility since then.

35.     Thus, for more than the past five years, LKQ has been a permittee subject to the General Permit's requirements at the Wilmington Facility.

36.     The Sun Valley Facility has been enrolled under the General Permit since at least April 7, 1992, and LKQ has been a permittee under the General Permit for the Sun Valley Facility since then.

37.     Thus, for more than the past five years, LKQ has been a permittee subject to the General Permit's requirements at the Sun Valley Facility.

38.     Other than coverage under the General Permit, the Facilities lack NPDES permit authorization for any wastewater discharges.

39.     The General Permit contains certain absolute prohibitions. Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of

materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Discharge Prohibition III.C of the General Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation VI.B of the General Permit prohibits discharges that adversely impact human health or the environment. Receiving Water Limitation VI.A of the General Permit prohibits discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

40.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural provisions with which dischargers must comply. At a minimum, dischargers must employ measures to reduce or eliminate stormwater pollution that constitute the Best Available Technology Economically Achievable ("BAT") and the Best Conventional Pollutant Control Technology ("BCT"). General Permit § V.A. EPA and the State Board have published Benchmark Values set at the maximum level of pollutant loading generally expected if an industrial facility is employing BAT and BCT (set forth in Attachment 1 to this Complaint).[2] Similarly, in the General Permit, the State Board has established Numeric Action Limits ("NALs") (set forth in Attachment 1 to this Complaint). While a discharge in violation of an NAL is not, by itself, a violation of the General Permit, NAL violations do provide evidence that a facility is not employing BAT

---

[2] These Benchmark Values can be found at
https://www.epa.gov/sites/production/files/2015-10/documents/msgp2015_fs.pdf
(applicable benchmarks for all parameters except aluminum and copper) and
https://www.epa.gov/sites/default/files/2021-01/documents/2021_msgp_-
_fact_sheet.pdf (applicable benchmarks for aluminum and copper (freshwater)).

1   and BCT.[3]

2   41.     Dischargers must develop and implement a SWPPP at the time
3   industrial activities begin. General Permit § X.A. The SWPPP must identify and
4   evaluate sources of pollutants associated with industrial activities that may affect the
5   quality of storm and authorized non-stormwater discharges from the facility. *Id*. The
6   SWPPP must identify and implement site-specific best management practices
7   ("BMPs") to reduce or prevent pollutants associated with industrial activities in
8   stormwater and authorized non-stormwater discharges. *Id*. The SWPPP must include
9   BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id.*;
10  *id.* at I.D.(32).

11  42.     The SWPPP must include: a narrative description and summary of all
12  industrial activity, potential sources of pollutants, and potential pollutants; a site map
13  indicating the stormwater conveyance system, associated points of discharge,
14  direction of flow, areas of actual and potential pollutant contact, including the extent
15  of pollution generating activities, nearby water bodies, and pollutant control
16  measures; a description of stormwater management practices; a description of the
17  BMPs to be implemented to reduce or prevent pollutants in stormwater discharges
18  and authorized non-stormwater discharges; the identification and elimination of non-
19  stormwater discharges; the location where significant materials are being shipped,
20  stored, received, and handled, as well as the typical quantities of such materials and
21  the frequency with which they are handled; a description of dust and particulate
22  generating activities; and a description of individuals and their current
23  responsibilities for developing and implementing the SWPPP. *Id.* at X.A.

24

25  ───────────────
26  [3] The Fact Sheet accompanying the General Permit says: "The annual NALs are
    derived from, and function similarly to, the benchmark values provided in the 2008
27  [Multi-Sector General Permit]." Fact Sheet § I.D.5; *see also id*. at § II.K.1.

Case No.                          Page 15                        Complaint
28

43.     The General Permit also requires facility operators to properly operate and maintain any facilities and systems of treatment and control installed or used to achieve compliance with the conditions of the General Permit and requirements of the SWPPP at all times. *Id.* at XXI.F. The SWPPP and site maps must be assessed and revised as necessary to ensure accuracy and effectiveness. *Id.* at X.B.

44.     In addition, dischargers are required to prepare and implement a Monitoring Implementation Plan ("MIP") as part of their SWPPP. *Id.* at X.I. The MIP requirements specify visual observation procedures and locations, sampling procedures, locations, and methods that dischargers must comply with. *Id.* at X.I, XI.A., B.

45.     Pursuant to the monitoring and reporting requirements of the General Permit, facility operators must conduct ongoing visual observations of stormwater and non-stormwater discharges and record responsive measures taken to eliminate unauthorized non-stormwater and to reduce or prevent pollutants in stormwater and authorized non-stormwater discharges. *Id.* at XI.A.1.  Facility operators must collect samples of stormwater discharges from *all* locations where stormwater may be discharged from the facility. *Id.* at XI.B.4. Facility operators must submit Annual Reports to the Regional Board accurately reporting their monitoring activity. *Id.* at XVI.A.

## V.     STATEMENT OF FACTS

46.     Numerous pollutant-generating activities at the Facilities occur outdoors in uncovered areas exposed to rainfall and stormwater runoff. As a result, contaminated stormwater runs off the Facilities from the discharge points identified in LKQ's SWPPPs and discharges to the receiving waters identified in LKQ's SWPPPs, including the receiving waters identified above. Pursuant to the General Permit, this contaminated stormwater discharge obligates LKQ to develop,

implement, and update and revise a SWPPP for each facility to minimize the discharge of pollutants to a level commensurate with application of BAT and BCT. In addition, the SWPPPs and LKQ's implementation of the SWPPPs must prevent LKQ's discharges from causing or contributing to violations of Water Quality Standards for the waters which receive LKQ's discharges. LKQ must also monitor and sample the Facilities' stormwater discharges, and meet various other limitations on its stormwater discharges.

47.     LKQ has failed to comply with these and other requirements of the General Permit, as further described below, in violation of the CWA.

### A.     Discharges in Violation of the CWA and General Permit

48.     The CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of a NPDES permit. CWA § 301(a), 33 U.S.C. § 1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities). "Any [NPDES] permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action." 40 C.F.R. § 122.41(a)(1) (applicable to federally-issued NPDES permits); *id*. § 123.25(a)(12) (incorporating this standard into state-issued NPDES permits, such as the General Permit).

49.     In California, a facility may discharge storm water associated with industrial activity only if the facility complies with the terms of the General Permit. The General Permit imposes several types of conditions on storm water dischargers, including effluent limitations (technology-based and receiving water-based), mandatory development and implementation of a SWPPP and monitoring implementation plan, and compliance with other monitoring and reporting requirements. Each of these types of General Permit conditions constitutes an

"effluent standard or limitation" for purposes of CWA section 505(a)(1) and (f), 33 U.S.C. § 1365(a)(1) and (f). As set forth below, LKQ has discharged polluted stormwater associated with industrial activity while violating each of these types of restrictions at both the Wilmington Facility and the Sun Valley Facility, thereby violating CWA section 301(a), 33 U.S.C. § 1311(a), and CWA section 402(p), 33 U.S.C. § 1342(p).

### 1.  Discharges in Violation of Technology-Based Effluent Limitations.

50.     The General Permit contains technology-based effluent limitations that prohibit LKQ's Facilities from discharging pollutants above the level commensurate with the application of BAT and BCT levels of control. *See* General Permit § V.A.

51.     As reflected in Attachment 1 to this Complaint, the Facilities have repeatedly discharged stormwater from the discharge locations ("outfalls") identified in LKQ's SWPPPs containing pollutant levels exceeding Benchmark Values and NALs, which indicates that the Facilities have discharged pollutants above a level commensurate with application of BAT and BCT. Moreover, LKQ has failed to implement BMPs at the Wilmington Facility and Sun Valley Facility that constitute BAT or BCT levels of control within LKQ's industry.

52.     Attachment 1 compiles some of the self-monitoring data reported by the Facilities to the State Board reflecting the Facilities' sampling of actual stormwater discharges. The sample results reflected in Attachment 1 are representative of the pollutant levels in the Facilities' discharge of stormwater. Thus, every instance when the Facilities have discharged stormwater, including instances when the Facilities have discharged stormwater that it has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set

forth in Attachment 1.

### a.   Inadequate BMPs at the Wilmington Facility

53.     LKQ has failed to implement BMPs at the Wilmington Facility that constitute BAT or BCT levels of control. As evidence of this, these BMPs have proven inadequate to bring LKQ's pollutant discharges below the Benchmark Values and NALs. LKQ's self monitoring data indicates that the Wilmington Facility entered ERA Level 1 status for copper on July 1, 2016, based on an NAL exceedance for copper reported in the 2015-2016 reporting year (sampling event on March 11, 2016). *See* Attachment 1. To address LKQ's copper exceedance at the Wilmington Facility, by January 1, 2017, LKQ was required to evaluate and implement any necessary BMPs or SWPPP revisions. However, LKQ's subsequent sampling in reporting year 2016-2017 showed continued exceedances for copper, along with exceedances for zinc and pH. *See* Attachment 1. This provides an indication that LKQ has failed to implement BMPs constituting BAT/BCT.

54.     On December 14, 2017, LKQ submitted an ERA Level 1 Report for zinc, copper, and pH. This ERA Level 1 Report called for the implementation of a variety of BMPs (such as installation of gravel/sand bags and others).

55.     However, these BMPs also failed to constitute BAT or BCT levels of control, in violation of the General Permit. LKQ's Wilmington Facility continued to have NAL exceedances for copper and zinc based on additional storm water sampling in the 2017-2018 reporting year. *See* Attachment 1. As a result, on July 1, 2018, the Wilmington Facility entered ERA Level 2 status for zinc and remained in ERA Level 2 status for copper.

56.     On December 27, 2018, LKQ filed the ERA Level 2 Action Plan with respect to zinc and copper. This ERA Level 2 Action Plan called for the implementation of some additional housekeeping and operational BMPs, such

additional sweeping of the Facility and minimizing certain use of heavy equipment.

57.     LKQ's subsequent sampling, however, showed the continuation of discharge problems. For example, LKQ's sampling on February 14, 2019 showed copper levels of 0.035 mg/L at Outfall F, which continued the trends before, including the sampling from December 6, 2018, which showed copper levels of 0.0429 mg/L. *See* Attachment 1. Each of these sample results was above the annual average NAL of 0.0332 mg/L. Thereafter, this trend continued, and based on sampling conducted on March 12, 2020, LKQ had an annual average NAL exceedance for copper in reporting year 2019-2020. *Id.*

58.     On December 17, 2020, LKQ submitted LKQ's ERA Level 2 Technical Report. In the ERA Level 2 Technical Report, LKQ indicated that it implemented an additional source control BMP as of October 2020, consisting of drain rack improvements for collection of coolant and other fluids.

59.     All BMPs that LKQ has implemented, including this drain rack improvement, have failed to constitute BAT or BCT levels of control, in violation of the General Permit. Indeed, LKQ's Wilmington Facility continued to have NAL exceedances for copper and zinc based on additional storm water sampling in the 2020-2021 reporting year. *See* Attachment 1. Moreover, in the 2020-2021 reporting year, LKQ also reported NAL exceedances for two additional metals: aluminum and iron. *Id*. Notably, LKQ's Wilmington Facility had not had NAL exceedances for aluminum or iron in the past, which indicates that, if anything, the effectiveness of LKQ's BMPs at the Wilmington Facility has worsened over time, not improved. In addition, LKQ reported high levels of oil and grease in LKQ's Facility's discharge (including one sample result of 32.6 mg/L at Outfall F, well above the annual average NAL of 15 mg/L, and above the instantaneous maximum of 25 mg/L).

60.     On October 25, 2021 and on December 14, 2021, LKQ conducted

additional stormwater sampling at the Wilmington Facility. The results from these samples show average NAL exceedances for copper and zinc. This is a continuation of the discharge violations that have plagued this Facility since 2015. Indeed, the average level of these pollutants was higher in these samples than in the previous year, indicating that these problems continue to get worse, not better. *See* Attachment 1. These consistent, ongoing discharges of significantly elevated levels of metals and other pollutants indicate that LKQ has not implemented BMPs that arise to the level of BAT or BCT levels of control at the Wilmington Facility.

61.     This is particularly true given that LKQ has implemented additional BMPs at other automotive dismantling facilities of the same kind as the Facilities that LKQ also owns and operates. These include capture and retention BMPs (including construction of detention/retention basins), and treatment control BMPs (including installation of active treatment systems). The fact that LKQ has implemented these additional BMPs at LKQ's other facilities provides evidence that these additional BMPs constitute BAT and BCT levels of control within LKQ's industry. This, in turn, indicates that LKQ has not implemented BMPs at the Wilmington Facility that constitute BAT/BCT levels of control.

**b.     Inadequate BMPs at the Sun Valley Facility**

62.     Like the Wilmington Facility, LKQ has also failed to implement BMPs at the Sun Valley Facility that constitute BAT or BCT levels of control. As evidence of this, these BMPs have proven inadequate to bring LKQ's pollutant discharges below the Benchmark Values and NALs. LKQ's self monitoring data indicates that on July 1, 2016, the Sun Valley Facility entered ERA Level 1 status for aluminum, iron, total suspended solids ("TSS"), oil and grease, copper, and zinc, based on an NAL exceedance that LKQ's reported in the 2015-2016 reporting year. On December 8, 2016, LKQ filed the Level 1 ERA Report. This Level 1 ERA

Report called for the implementation of various BMPs to attempt to address the issues (such as sweeping measures, installing a temporary gravel bag berm, and others).

63.     Thereafter, LKQ continued to report significant exceedances of NALs and Benchmark Values. In particular, LKQ's sampling reports from the 2016-2017 reporting year showed NAL exceedances for aluminum, iron, and copper (and LKQ failed to have LKQ's sampled analyzed for zinc). These exceedances were caused by inadequate BMPs and inadequate BMP implementation.

64.     As further evidence of this, on May 6, 2017, the California Environmental Protection Agency received a complaint of BMP violations and water quality problems at the Sun Valley Facility. On October 18, 2017, the Regional Board conducted an unannounced site inspection of the Sun Valley Facility. The Regional Board inspector concluded that the Sun Valley Facility had significant BMP violations, including exposed auto parts on the ground, antifreeze spills on the ground, and poor housekeeping practices overall. *See* Attachment 2 (site inspection photos showing inadequate BMP implementation). This demonstrates that, notwithstanding LKQ's contentions in the ERA Level 1 Report submitted over a year prior, LKQ was not complying with the BMPs that it had committed to implement, in violation of the General Permit. This also demonstrates that LKQ failed to adequately implement its MIP and comply with the monitoring and reporting obligations in the General Permit. This conclusion was confirmed by the Regional Board in a Notice of Violation issued on November 22, 2017, which concluded that LKQ had violated General Permit sections X.H.2 (exposed auto parts on the ground) and X.H.1 (scrap metals, waste piles, oil spills and antifreeze spills on the ground).

65.     As a result of the exceedances in the 2016-2017 reporting year, the

Sun Valley Facility entered ERA Level 2 status for aluminum, iron, and copper on July 1, 2017. On December 18, 2017, LKQ filed the Level 2 ERA Action Plan for the Sun Valley Facility. The Action Plan called for implementation of certain new BMPs (including retrofitting the existing trench drain at Outfall F, deployment of oil absorbent socks and straw wattles in certain areas, and others). This included the deployment of metal media socks and sorptive clay filter bags in the flow paths leading to Outfalls A, B, and D with the explicit purpose "[t]o achieve BAT/BCT." Notably, LKQ's references to implementation of new measures to achieve BAT/BCT is an admission that all measures implemented previously failed to constitute BAT/BCT, in violation of the General Permit. In addition, these BMPs did not, in actuality, constitute BAT/BCT levels of control.

66.     In the 2017-2018 reporting year, LKQ failed to self-report any storm water sampling results, which violated the General Permit. Although LKQ contended that a lack of adequate rainfall precluded the requisite sampling, there were several QSEs during this time that LKQ was required to sample. *See* Attachment 3. The sampling that LKQ conducted in the following reporting year showed a continuation of the prior trend of exceedances, with exceedances for aluminum and iron. *See* Attachment 1.

67.     On September 19, 2018, LKQ submitted an updated Level 2 ERA Action Plan. This Level 2 ERA Action Plan violated the General Permit because it did not call for any additional BMPs beyond those that were called for in the Level 2 ERA Action Plan dated December 18, 2017. As such, this Level 2 ERA Action Plan violated the General Permit by failing to call for the implementation of BAT/BCT levels of control at the Sun Valley Facility.

68.     On December 26, 2018, LKQ submitted a Level 2 ERA Technical Report. Once again, this Level 2 ERA Technical Report violated the General Permit

because it did not call for any additional BMPs beyond those that were called for previously. As noted, these prior BMPs failed to address LKQ's discharge problems. As such, this Level 2 ERA Technical Report violated the General Permit by failing to call for the implementation of BAT/BCT levels of control at the Sun Valley Facility.

69.     As noted, in the 2018-2019, the next year LKQ reported sampling results, LKQ continued to have significant discharge problems, with NAL exceedances for aluminum and iron, as well as consistently high results for other parameters (including TSS, copper, and zinc). Moreover, LKQ sampled only one Outfall during this reporting year (Outfall F), which constituted a violation of the General Permit and contributed to the lower sampling results (including because this Outfall does not include drainage from all industrial activities, including LKQ's vehicle crushing, draining, impounding or storage activities).

70.     On December 27, 2019, LKQ submitted a Level 2 ERA Technical Report. This Technical Report called for implementation of certain new BMPs minimizing the use of heavy equipment at certain times, removal of equipment, and relocation of equipment used for parts).

71.     This Level 2 ERA Technical Report violated the General Permit because it did not call for all BMPs necessary to constitute BAT/BCT levels of control at the Sun Valley Facility. Notably, LKQ failed to implement the additional BMP that it proposed (pumping/conveyance of stormwater at Drainage Area A/Outfall F to areas of on-site retention). In addition, LKQ continued to have NAL exceedances after implementing these BMPs. Specifically, while LKQ only conducted one storm water sampling event during the 2019-2020 reporting year, this storm water sample showed an NAL exceedance for copper, indicating that this continued to be a discharge problem at the Sun Valley Facility.

72.     In the 2020-2021 reporting year, LKQ again failed to conduct the requisite number of storm water samples, only taking one such sample during the reporting year, in violation of the General Permit. Nonetheless, this single sample showed a continuation of the elevated levels of copper in LKQ's discharges. Moreover, as of the date of this Complaint, LKQ has failed to conduct storm water sampling any time in the 2021-2022 reporting year, despite the fact that QSEs have occurred that would have enabled LKQ to sample, thus violating the General Permit. *See* Attachment 3.

73.     On December 30, 2020, Regional Board staff conducted a site inspection of the Sun Valley Facility to follow up on a complaint forwarded from the California Environmental Protection Agency. As noted in the inspection report:

> The complaint stated that a pond of water of approximately 200 feet across and 13 inches deep, formed at the facility's parking lot for months, collecting litter, oils, algae, and other debris. During the morning of May 20, 2020, an LKQ Pick-Your-Part employee attached a junk sedan vehicle in front of a bulldozer and pushed thousands of gallons of oily water out to the street. The water was pushed out to the street with [such] great force that it splashed onto sidewalks, walls, and buildings.

74.     A follow up inspection from the City of Los Angeles issued LKQ's manager a misdemeanor citation for this violation. This event demonstrates that LKQ has violated the very BMPs that it claims to have implemented (i.e., onsite ponding and evaporation of stormwater runoff). This also demonstrates that LKQ failed to adequately implement its MIP and comply with the monitoring and reporting obligations in the General Permit.

75.     The inadequacy of LKQ's BMPs at the Sun Valley Facility is also

supported by the fact that LKQ has implemented additional BMPs at other automotive dismantling facilities of the same kind as the Facilities that LKQ also owns and operates. These include capture and retention BMPs (including construction of detention/retention basins), and treatment control BMPs (including installation of active treatment systems). The fact that LKQ has implemented these additional BMPs at LKQ's other facilities provides evidence that these additional BMPs constitute BAT and BCT levels of control within LKQ's industry. This, in turn, indicates that LKQ has not implemented BMPs at the Sun Valley Facility that constitute BAT/BCT levels of control.

### 2. Discharges in Violation of Water Quality-Based Effluent Limitations.

76.     In addition to technology-based effluent limitations, the General Permit also contains water quality-based effluent limitations. These water quality-based effluent limitations prohibit a facility from discharging pollutants at a level that: causes or contributes to an exceedance of any applicable Water Quality Standard; adversely affects human health or the environment; or threatens to cause pollution or a public nuisance. General Permit § VI.A-C. Water Quality Standards that are applicable to the Facilities are established in, *inter alia*, the Basin Plan and CTR. Of note, the General Permit requires dischargers to go beyond implementing minimum BMPs necessary to meet technology-based effluent limitations if necessary to comply with any more stringent Water Quality Standards. *See* General Permit, Fact Sheet § II.D.1.

77.     The CWA requires that water bodies like the Tujunga Wash, Dominguez Channel, Los Angeles River, Los Angeles Harbor, San Pedro Bay, and the Pacific Ocean meet water quality objectives that protect specific "beneficial uses."

78.     The Basin Plan establishes the following beneficial uses of the Dominguez Channel downstream from the discharge points from the Wilmington Facility, among others: navigation; commercial and sport fishing; estuarine habitat; marine habitat; wildlife habitat; rare, threatened, or endangered species habitat; habitat for the migration of aquatic organisms; and habitat for the spawning, reproduction, and/or early development of fish.

79.     The beneficial uses of the Los Angeles Harbor downstream from the discharge points from the Wilmington Facility (including the outer harbor, inner harbor areas, marinas, public beach areas, and the Dominguez Channel Estuary) include: navigation; commercial and sport fishing; estuarine habitat; marine habitat; wildlife habitat; rare, threatened, or endangered species habitat; habitat for the migration of aquatic organisms; habitat for the spawning, reproduction, and/or early development of fish; and shellfish harvesting.

80.     The Basin Plan establishes the following beneficial uses of the Tujunga Wash: groundwater recharge (intermittent), warm freshwater habitat (proposed), cold freshwater habitat (proposed), and wildlife habitat (proposed).

81.     The Basin Plan establishes the following Water Quality Standards for Inland Surface Waters (which includes the Tujunga Wash and Los Angeles River):

- Waters shall not contain oils, greases, waxes or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses. Basin Plan at 3-34.

- Waters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses. *Id.* at 3-44.

- Waters shall be free of changes in turbidity that cause nuisance or

1    adversely affect beneficial uses. *Id*. at 3-46.

2    82.     In addition, the Basin Plan contains a list of receiving waters that are

3    303(d) listed as impaired for pollutants that are likely to be associated with General.

4    The Basin Plan contains the following relevant 303(d) listings with respect to the

5    receiving waters receiving discharge from the Facilities:

6        • The Dominguez Channel Estuary (from Los Angeles Inner Harbor to

7           Vermont Avenue, which includes the discharge point from the

8           Wilmington Facility): lead and copper.

9        • The Los Angeles / Long Beach Inner Harbor: copper and zinc.

10       • The Los Angeles Harbor – Fish Harbor: lead, copper, and zinc.

11       • The Tujunga Wash (Hansen Dam to the Los Angeles River): copper.

12       • Reach 3 of the Los Angeles River, downstream of the Tujunga Wash:

13          copper.

14       • Reaches 2 and 1 of the Los Angeles River, downstream of the

15          Tujunga Wash: Reach 2 – copper and lead; Reach 1 – lead, copper,

16          and zinc.

17   83.     LKQ's discharges of stormwater from the Wilmington and the Sun

18   Valley Facilities from the discharge locations ("outfalls") identified in LKQ's

19   SWPPPs have caused or contributed to an exceedance of one or more of the above-

20   listed Water Quality Standards. Attachment 1 to this Complaint compiles some of

21   the self-monitoring data reported by the Wilmington and Sun Valley Facilities. The

22   sample results reflected in Attachment 1 are representative of the pollutant levels in

23   the Facilities' discharges of stormwater, including such discharges that LKQ did not

24   sample or analyze. Thus, in every instance when the Facilities have discharged

25   stormwater, including instances when the Facilities have discharged stormwater that

26   LKQ has not sampled, this stormwater discharge has contained levels of pollutants

27

28

1  comparable to the levels set forth in Attachment 1.

2  84.      Attachment 1 indicates that the Facilities routinely discharge
3  stormwater to the Dominguez Channel Estuary, the Los Angeles / Long Beach
4  Harbor, the Tujunga Wash, the Los Angeles River, and all other 303(d)-listed
5  receiving waters noted above, containing, *inter alia*, the following pollutants: TSS,
6  oil and grease, aluminum, lead, copper, zinc, and iron. The levels of these pollutants
7  in LKQ's Facilities' stormwater discharges indicate that LKQ's discharges have
8  threatened to cause pollution or public nuisance and adversely affected human health
9  or the environment in violation of the water quality-based effluent limitations of the
10 General Permit § VI.B-C and VII.B. In addition, the discharge of these pollutants
11 has caused the Dominguez Channel Estuary, the Los Angeles / Long Beach Harbor,
12 the Tujunga Wash, the Los Angeles River, and all other 303(d)-listed receiving
13 waters noted above, to not attain or contributed to these waters not attaining one or
14 more applicable Water Quality Standards in violation of the water quality-based
15 effluent limitations of the General Permit. *See id*. at VI.A and VII.B. Moreover, the
16 discharge of these pollutants has caused or contributed to the Dominguez Channel
17 Estuary, the Los Angeles / Long Beach Harbor, the Tujunga Wash, the Los Angeles
18 River, San Pedro Bay, and the Pacific Ocean to fail to meet one or more of the
19 designated beneficial uses for these waters established in the Basin Plan, including,
20 but not limited to, beneficial uses for: commercial and sport fishing; estuarine
21 habitat; marine habitat; wildlife habitat; rare, threatened, or endangered species
22 habitat; habitat for the migration of aquatic organisms; habitat for the spawning,
23 reproduction, and/or early development of fish; and shellfish harvesting.

24  **3.      Violations of Other General Permit Requirements.**

25      **a.      Violations at the Wilmington Facility**

26  85.      As noted above, LKQ's self-monitoring data indicates that the

Wilmington Facility entered ERA Level 1 status for copper on July 1, 2016, based on an NAL exceedance for copper reported in the 2015-2016 reporting year (sampling event on March 11, 2016). *See* Attachment 1. Despite being obligated under the General Permit to complete an ERA Level 1 Evaluation by October 1, 2016, LKQ did not complete any such evaluation, in violation of the General Permit. *See* General Permit § XII.C.1.

86.     Further, to address LKQ's copper exceedance at the Wilmington Facility, by January 1, 2017, LKQ was required to evaluate or implement any BMPs or SWPPP revisions, and to create the required Level 1 ERA Report and upload it to SMARTS. *See id.* at XII.C.2. However, LKQ failed to do so, in violation of the General Permit.

87.     Indeed, as noted in Section V.A.1. above, LKQ has never implemented BMPs that constitute BAT/BCT levels of control at the Wilmington Facility. Therefore, every Level 1 ERA Report, Level 2 ERA Action Plan, and Level 2 ERA Technical Report the LKQ has submitted has violated the General Permit by failing to call for the implementation of BAT/BCT levels of control at the Wilmington Facility.

88.     LKQ's subsequent sampling in reporting year 2016-2017 showed exceedances for zinc, copper, and pH. *See* Attachment 1. Based on these exceedances, on July 1, 2017, the Wilmington Facility entered ERA Level 1 status for zinc and pH, and entered ERA Level 2 status for copper. *See* Stormwater Industrial Permit § XII.D ("A Discharger's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1."). LKQ subsequently failed to complete the required ERA Level 1 Evaluation for zinc and pH by October 1, 2017, in violation of the General Permit.

89.     On December 14, 2017, LKQ submitted an ERA Level 1 Report for zinc, copper, and pH. This report violated the General Permit because it incorrectly contended that the Wilmington Facility was in ERA Level 1 Status for copper at this time, when in actuality, it was in ERA Level 2 status for copper at this time. This ERA Level 1 Report also violated the General Permit by failing to identify all pollutant sources at the Wilmington Facility (in particular, by failing to identify vehicle dismantling and crushing activities and residual/spilled coolant surrounding the drainage racks, each of which was identified in the pollutant source assessment in subsequent reports and plans). This ERA Level 1 Report called for the implementation of additional BMPs (noted above). However, LKQ did not incorporate these BMPs into the Wilmington SWPPP until December 5, 2019, nearly a year later. This violated the requirement to certify and upload via SMARTS a SWPPP revision within three months (or within 30 days for significant revisions). *See* General Permit § X.B.2-3.

90.     On December 27, 2018, LKQ filed the ERA Level 2 Action Plan with respect to zinc and copper. This ERA Level 2 Action Plan violated the General Permit because it incorrectly claimed that the Wilmington Facility had been in ERA Level 1 status for copper in the 2016-2017 reporting year, when in actuality, it was in ERA Level 2 status with respect to copper at that time, as noted above. In addition, LKQ violated the General Permit by filing this ERA Level 2 Action Plan a year late with respect to copper, as it was required to be completed by January 1, 2018 with respect to copper. In addition, this ERA Level 2 Action Plan also violated the General Permit by failing to identify all pollutant sources at the Wilmington Facility (in particular, by failing to identify residual/spilled coolant surrounding the drainage racks, which was identified in the pollutant source assessment in the December 17, 2020 ERA Level 2 Technical Report). In addition, this Level 2 ERA

Action Plan violated General Permit section XII.D.1.e by failing to include a schedule and detailed description of the tasks required to complete LKQ's selected demonstration(s) under section XII.D.2.a-c.

91.    This ERA Level 2 Action Plan called for the implementation of various BMPs (noted above). LKQ's ERA Level 2 Action Plan states that these BMPs will be incorporated into the SWPPP and Site Map and uploaded to SMARTS as required. However, LKQ did not incorporate these BMPs into the Wilmington SWPPP when it next updated the Wilmington SWPPP on December 5, 2019, instead merely referring to the BMPs from LKQ's ERA Level 1 Report, in violation of the General Permit. In fact, LKQ did not incorporate these BMPs into the Wilmington SWPPP until it was updated on June 15, 2020, approximately a year and a half after filing LKQ's ERA Level 2 Action Plan calling for such SWPPP revisions. This violated the requirement to certify and upload via SMARTS a SWPPP revision within three months (or within 30 days for significant revisions). *See* General Permit § X.B.2-3.

92.    On February 14, 2019, LKQ conducted storm water sampling at the Wilmington Facility. However, LKQ failed to have two samples analyzed for oil and grease (for Outfalls A and F), in violation of the General Permit. *See* General Permit § XI.B.6.a (requiring all collected samples to be analyzed for oil and grease).

93.    On January 1, 2020, LKQ was required to submit the ERA Level 2 Technical Report to follow up on the ERA Level 2 Action Plan filed on December 27, 2018. *See* General Permit § XII.D.2. However, LKQ failed to submit any such ERA Level 2 Technical Report until December 17, 2020, approximately a year past the deadline. This violated the General Permit. In addition, along with LKQ's annual report due July 15, 2020, LKQ was required to submit either an update to the ERA Level 2 Technical Report, or a certification that there were no changes prompting an

update of the Level 2 ERA Technical Report. *See id*. at XII.D.3.c. LKQ failed to do either, in violation of the General Permit.

94.     On December 17, 2020, LKQ submitted LKQ's ERA Level 2 Technical Report. This ERA Level 2 Technical Report violated the General Permit because it incorrectly contended that LKQ's Wilmington Facility was in ERA Level 1 status for zinc, when in actuality, LKQ's Wilmington Facility remained in ERA Level 2 status for zinc. Neither LKQ's ERA Level 2 Action Plan, nor ERA Level 2 Technical Report, explain the basis for LKQ's contention that LKQ's Wilmington Facility had changed from Level 2 to Level 1 status for zinc. Under the General Permit, for a facility that undertakes an Industrial Activity BMP Demonstration (as LKQ undertook pursuant to LKQ's December 27, 2018 ERA Level 2 Action Plan), a parameter returns to Baseline status only after all BMPs have been implemented and, thereafter, four consecutive QSEs show no exceedances for the parameter. *Id*. at XII.D.4.a. LKQ's ERA Level 2 Technical Report indicated that the last BMP to be implemented at the Wilmington Facility (the drain rack improvements) was implemented in October 2020. Thereafter, LKQ has not sampled four consecutive QSEs without detecting NAL exceedances for zinc. On the contrary, LKQ's reports uploaded to SMARTS indicate that LKQ had sampled two QSEs since October 2020 (on December 28, 2020 and March 11, 2021), and these sample results show average NAL exceedances for zinc (as well as other parameters). *See* Attachment 1. Therefore, LKQ's ERA Level 2 Technical Report violated the General Permit by incorrectly claiming that the Wilmington Facility was in ERA Level 1 status for zinc, when it was actually still in ERA Level 2 status for zinc. Even if LKQ contends that the applicable BMP implementation was completed in November 2018, LKQ still failed to sample four consecutive QSEs that without detecting an annual NAL exceedance for zinc, as LKQ had an annual NAL exceedance for zinc based on the

1  sample dated December 28, 2020 (which was the fourth QSE sampled after
2  November 2018).

3      95.      As a result of this error concerning zinc, the December 17, 2020 ERA
4  Level 2 Technical Report also violated the General Permit by failing to analyze or
5  propose the implementation of additional BMPs to address its zinc exceedances.

6      96.      In addition, along with LKQ's annual report due July 15, 2021, LKQ
7  was required to submit either an update to the ERA Level 2 Technical Report, or a
8  certification that there were no changes prompting an update of the Level 2 ERA
9  Technical Report. *See id*. at XII.D.3.c. LKQ failed to do either, in violation of the
10 General Permit.

11     97.      On December 28, 2020, LKQ conducted storm water sampling at the
12 Wilmington Facility. However, LKQ failed to have any of the three samples
13 analyzed for pH, in violation of the General Permit. *See* General Permit § XI.B.6.b
14 (requiring all collected samples to be analyzed for pH). Similarly, on March 11,
15 2021, LKQ conducted storm water sampling at the Wilmington Facility. However,
16 LKQ failed to have two samples analyzed for aluminum (for Outfalls A and E), in
17 violation of the General Permit. *See* General Permit § XI.B.6.d (requiring all
18 collected samples to be analyzed for all applicable parameters listed in Table 1) and
19 Table 1 (requiring SIC Code 5015 operations to have samples analyzed for
20 aluminum).

21     98.      Indeed, whenever LKQ took storm water samples at the Wilmington
22 Facility or Sun Valley Facility, and failed to have any of those samples analyzed for
23 all of the parameters required by the General Permit, LKQ violated the provisions of
24 the General Permit relating to monitoring and reporting on LKQ's storm water
25 discharges. This includes sampling for the parameters listed in Tables 1 and 2 of the
26 General Permit.

27
28

99.    In addition, General Permit section XI.B.6.c requires dischargers to sample "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment (Section X.G)." In turn, § X.G.2 requires that a discharger assess in its pollutant source assessment "[a]t a minimum . . . [t]he pollutants likely to be present in industrial storm water discharges . . . ." *(id.* at X.G.2.a.ii), as well as "the industrial pollutants related to the receiving waters with 303(d) listed impairments identified in Appendix 3 or approved TMDLs that may be causing or contributing to an exceedance of a water quality standard in the receiving waters." *(id.* at X.G.2.a.ix). Here, LKQ's SWPPPs have identified various pollutants, including copper and zinc, as being part of LKQ's Facilities' discharges. *See, e.g.*, Wilmington SWPPP at 3. LKQ's SWPPPs have also identified various pollutants, including copper and zinc, as being potential pollutants that may be released as a result of spills or leaks from LKQ's Facilities. *See, e.g.*, *id.* at Table 2-2. Furthermore, LKQ's SWPPPs have noted that "[b]ased upon 303(d) receiving water limitations, stormwater samples are additionally [required to be] analyzed for copper and zinc." *See, e.g.*, *id.* Moreover, the Regional Board had required all auto dismantlers within SIC Code 5015 (which is also LKQ's SIC Code) to monitor and sample for copper and zinc during the term of the previous General Permit. *See* Fact Sheet § J.3. This indicates that copper and zinc are common pollutants that may be present in storm water discharges from industrial facilities such as LKQ'ss. *See also* General Permit, Table 2 (listing NAL values for common pollutants, including copper, zinc, and nickel). Lastly, in the Inspection Report of December 30, 2020, the Regional Board identifies nickel as an additional parameter that LKQ is required to analyze in LKQ's storm water sampling. *Id.* at 2 ("Stormwater Water Sample Analytical Data" table). Indeed, nickel is a common pollutant in vehicle salvage yard

operations because they process stainless steel and other metals containing nickel.[4] Accordingly, in each instance when LKQ was required to take storm water samples, LKQ's failure to have LKQ's samples analyzed for TSS, oil and grease, pH, iron, lead, aluminum, copper, zinc or nickel constituted a violation of the General Permit.

100.    On December 14, 2021, LKQ filed a Level 1 ERA Report for the Wilmington Facility. This report violated the General Permit by incorrectly claiming that the average annual NAL value for aluminum was 1.0248 mg/L, when in fact it was 1.28 mg/L.[5] This report also incorrectly failed to note that LKQ had an instantaneous exceedance of oil and grease of 32.6 mg/L during the reporting year. In addition, this report violated the General Permit because it incorrectly contended that LKQ's Wilmington Facility was in ERA Level 1 status for zinc, when in actuality, LKQ's Wilmington Facility remained in ERA Level 2 status for zinc.

101.    On December 14, 2021, LKQ filed a Level 2 ERA Technical Report for the Wilmington Facility. The "NAL Exceedance Summary" of this report was incorrect because it incorrectly contended that the Facility was in ERA Level 1 status for zinc in reporting year 2020-2021, when in fact it was in ERA Level 2 status for zinc at this time. As a result of this error concerning zinc, the ERA Level 2 Technical Report also violated the General Permit by failing to analyze or propose the implementation of additional BMPs to address its zinc exceedances.

---

[4] *See* Occupational Safety and Health Administration, Guidance for the Identification and Control of Safety and Health Hazards in Metal Scrap Recycling at 5 (noting nickel is a common metal recycled from stainless steel); *id*. at 25 (noting "Nickel may be present as fumes or as dust in industries that process nickel scrap."), *available at* https://www.osha.gov/sites/default/files/publications/OSHA3348-metal-scrap-recycling.pdf (last visited Oct. 12, 2021).

[5] This was apparently based on the incorrect assumption that five samples had been analyzed for aluminum during the reporting year, when in fact only four had been analyzed for aluminum (the sample of Outfall E from March 11, 2021 was not analyzed for aluminum).

102.    On December 29, 2021, LKQ filed an updated SWPPP for the Wilmington Facility. This updated SWPPP incorrectly contended that the Facility was in ERA Level 1 status for zinc, when in fact it was in ERA Level 2 status for zinc at this time, in violation of the General Permit.

**b.    Violations at the Sun Valley Facility**

103.    As noted above, LKQ's self monitoring data indicates that on July 1, 2016, the Sun Valley Facility entered ERA Level 1 status for aluminum, iron, TSS, oil and grease, copper, and zinc, based on an NAL exceedance that LKQ's reported in the 2015-2016 reporting year. LKQ was required to complete the ERA Level 1 Evaluation by October 1, 2016. However, LKQ failed to do so, in violation of the General Permit. *See* General Permit § XII.C.1.

104.    On December 8, 2016, LKQ filed a Level 1 ERA Report for the Sun Valley Facility. This report violated the General Permit because it did not address LKQ's exceedances for copper or zinc, despite the fact that LKQ's Sun Valley Facility entered ERA Level 1 status for copper and zinc on July 1, 2016.

105.    When the Sun Valley SWPPP was updated on January 31, 2017, it violated the General Permit because it failed to account for the fact that the Sun Valley Facility was in Level 1 ERA Status for copper and zinc, and failed to incorporate BMPs to address these parameters.

106.    As noted above, LKQ had significant leaks of oil and antifreeze, which were noted in a Regional Board inspection of the Sun Valley Facility on October 18, 2017. Each Site Map revision that LKQ has made since the date of these leaks has violated the General Permit by failing to identify the location where these significant leaks occurred. *See* General Permit § X.E.3.e. In addition, each SWPPP revision LKQ has made since these spills and leaks occurred has violated the General Permit by: failing to evaluate this area as an area where spills or leaks can

likely occur; failing to ensure that the SWPPP includes: a list of these industrial materials as part of the list of industrial materials that have spilled or leaked in significant quantities and have discharged, or had the potential to be discharged, from the Sun Valley Facility's storm water conveyance system within the previous five-year period; and a list of the toxic chemicals identified in 40 C.F.R. § 302, or oil and hazardous substances in excess of reportable quantities (40 C.F.R. §§ 110, 117, and 302) that have discharged from the Sun Valley Facility's storm water conveyance system within the previous five-year period; and failing to ensure that for each discharge or potential discharge, the SWPPP includes the location, characteristics, and approximate quantity of the materials spilled or leaked, and all other required information. *See id*. at X.G.1.d.

107.    On December 18, 2017, LKQ filed a Level 2 ERA Action Plan for the Sun Valley Facility. This Action Plan violated the General Permit because the "NAL Exceedance Summary" was incorrect by failing to mention previous NAL exceedances for copper and zinc from the 2015-2016 reporting year. In addition, this Level 2 ERA Action Plan also violated the General Permit by failing to identify all pollutant sources at the Sun Valley Facility. Specifically: it failed to identify dismantling and crushing activities, which were identified in the pollutant source assessment in the December 26, 2018 Level 2 ERA Technical Report; and it failed to identify the sources of copper pollutants, including wiring from the inventory of vehicles, which was identified in LKQ's Level 1 ERA Report dated December 17, 2020.

108.    In addition, LKQ failed to have its samples analyzed for zinc at any time during the 2016-2017 reporting year. This constituted a violation of the General Permit, as noted in the October 19, 2017 Inspection Report from the Regional Board (at page 3). Indeed, whenever LKQ took storm water samples at the Sun Valley

Facility, and failed to have any of those samples analyzed for all of the parameters required by the General Permit, LKQ violated the provisions of the General Permit relating to monitoring and reporting on LKQ's storm water discharges. In addition, as a result, this Action Plan underreported LKQ's exceedances for zinc, in violation of the General Permit.

109.    On September 17, 2018, the Regional Board issued a Notice of Violation, finding that LKQ's Level 2 ERA Action Plan dated December 18, 2017 violated the General Permit. In particular, the Notice of Violation found that the Level 2 ERA Action Plan violated General Permit section XII.D.1.e by failing to include a schedule and detailed description of the tasks required to complete LKQ's selected demonstration(s) under section XII.D.2.a-c. This constituted a violation of the General Permit. In addition, the Notice of Violation required LKQ to submit the revised Level 2 ERA Action Plan to the Regional Board by October 17, 2018. However, LKQ failed to correct these violations when it submitted an updated Level 2 ERA Action Plan on September 19, 2018, in violation of the General Permit.

110.    In the 2017-2018 reporting year, LKQ failed to self-report any storm water sampling results for the Sun Valley Facility, which violated the General Permit requirement to conduct storm water sampling for at least four QSEs each reporting year. *See* General Permit § XI.B.2 (requiring sampling of two QSEs during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30)). To the extent that LKQ contends that a lack of adequate rainfall precluded the requisite sampling, there were several QSEs during this time that LKQ was required to sample. *See* Attachment 3.

111.    On September 19, 2018, LKQ submitted an updated Level 2 ERA Action Plan. This Action Plan violated the General Permit because the "NAL

Exceedance Summary" was incorrect by failing to mention previous NAL exceedances for copper and zinc from the 2015-2016 reporting year. This Level 2 ERA Action Plan also violated the General Permit because the "NAL Exceedance Summary" incorrectly claimed that aluminum, iron and copper "enter[] Level 2 status for the 2017-2018 reporting year" when in actuality the Sun Valley Facility was already in Level 2 status for aluminum, iron, and copper during the 2017-2018 reporting year, due to the fact that the level of these pollutants in the Sun Valley Facility's stormwater discharges exceeded Level 2 ERA status levels as demonstrated by LKQ's sampling from the 2016-2017 reporting year.

112.     In addition, this Level 2 ERA Action Plan also violated the General Permit by failing to identify all pollutant sources at the Sun Valley Facility. Specifically: it failed to identify dismantling and crushing activities, which were identified in the pollutant source assessment in the December 26, 2018 Level 2 ERA Technical Report; and it failed to identify the sources of copper pollutants, including wiring, from the inventory of vehicles, which was identified in LKQ's Level 1 ERA Report for the Sun Valley Facility dated December 17, 2020.

113.     LKQ's Level 2 ERA Action Plan for the Sun Valley Facility also violated the General Permit because it did not call for any additional BMPs beyond those that were called for in LKQ's Level 2 ERA Action Plan dated December 18, 2017. As such, this Level 2 ERA Action Plan violated the General Permit by failing to call for the implementation of BAT/BCT levels of control at the Sun Valley Facility.

114.     Indeed, as noted in Section V.A.1. above, LKQ has never implemented BMPs that constitute BAT/BCT levels of control at the Sun Valley Facility. Therefore, every Level 1 ERA Report, Level 2 ERA Action Plan, and Level 2 ERA Technical Report the LKQ has submitted has violated the General Permit by

failing to call for the implementation of BAT/BCT levels of control at the Sun Valley Facility.

115.    Moreover, the September 19, 2018 Level 2 ERA Action Plan also violated the General Permit, section XII.D.1.e, by failing to include a schedule and detailed description of the tasks required to complete LKQ's selected demonstration(s) under section XII.D.2.a-c. This constituted a violation of the General Permit.

116.    On December 26, 2018, LKQ submitted a Level 2 ERA Technical Report. This Technical Report violated the General Permit because the "NAL Exceedance Summary" was incorrect by failing to include that the Sun Valley Facility was in Level 1 status for copper and zinc during the 2015-2016 reporting year. This Technical Report also violated the General Permit because the "NAL Exceedance Summary" incorrectly claimed that the Sun Valley Facility was in Level 1 status for copper during the 2016-2017 (Current) reporting year, when in actuality, the Facility was in Level 2 status for copper during the 2016-2017 reporting year. This Technical Report violated the General Permit because the "NAL Exceedance Summary" was incomplete by failing to include NAL exceedance information for the 2017-2018 reporting year, instead incorrectly reporting NAL information from the 2016-2017 reporting year as the "current" status of NAL exceedances. This Level 2 ERA Technical Report also violated the General Permit because it did not call for any additional BMPs beyond those that were called for previously. As such, this Level 2 ERA Technical Report violated the General Permit by failing to call for the implementation of BAT/BCT levels of control at the Sun Valley Facility.

117.    In the 2018-2019, the next year LKQ reported sampling results for the Sun Valley Facility, it sampled only one Outfall during the reporting year (Outfall F), which constituted a violation of the General Permit. To the extent that LKQ

contends that a lack of adequate rainfall precluded the requisite sampling, there were several QSEs during this time that LKQ was required to sample. *See* Attachment 3. In addition, LKQ violated the General Permit during the 2018-2019 reporting year by failing to have zinc analyzed in LKQ's sample taken on December 6, 2018 and by failing to have pH analyzed in LKQ's sample taken on January 14, 2019.

118.    On December 27, 2019, LKQ submitted a Level 2 ERA Technical Report for the Sun Valley Facility. This Technical Report violated the General Permit because the "NAL Exceedance Summary" was incorrect by failing to include copper and zinc as being in Level 1 status during the 2015-2016 reporting year. This Technical Report also violated the General Permit because the "NAL Exceedance Summary" incorrectly claimed that the Sun Valley Facility was in Level 1 status for copper during the 2016-2017 reporting year, when in actuality, the Facility was in Level 2 status for copper during the 2016-2017 reporting year. In addition, this Level 2 ERA Technical Report also violated the General Permit by failing to identify all pollutant sources at the Sun Valley Facility (in particular, by failing to identify oil and grease pollutant sources of any kind (such as residual fluids within the inventory of vehicles, bulk storage tanks of recovered automotive fluids, or equipment and vehicles used for on-site purposes), all of which were identified in the pollutant source assessments of LKQ's previous reports, including LKQ's Level 2 ERA Technical Report dated December 26, 2018). This Technical Report also violated the General Permit because it incorrectly contended that the levels of all pollutant parameters in the Sun Valley Facility's stormwater discharges returned to baseline designation except aluminum and iron. In actuality, the level of copper in these discharges did not return to baseline designation, because LKQ did not have four consecutive QSEs sampled with no NAL exceedances for copper. *See* General Permit § XII.D.4.a. Instead, because LKQ had NAL exceedances for copper in

LKQ's sampling of February 17, 2017, it did not have four consecutive QSEs without an NAL exceedance for copper as of the date of the Level 2 ERA Technical Report. Thus, the Technical Report inaccurately indicated that the Sun Valley Facility could be deemed no longer in Level 2 status for copper.

119.    In addition, LKQ violated the General Permit by conducting sampling of stormwater discharges from the Sun Valley Facility only one time during the 2019-2020 reporting year reporting year, instead of the required four QSEs.

120.    In the 2020-2021 reporting year, LKQ again failed to conduct the requisite number of storm water samples at the Sun Valley Facility, only taking one such sample during the reporting year, in violation of the General Permit. Nonetheless, this single sample showed a continuation of the elevated levels of copper in LKQ's discharges.

121.    On December 17, 2020, LKQ filed an updated SWPPP. This SWPPP violated the General Permit by stating that the Sun Valley Facility was in Level 1 status for copper, when in actuality, it was in Level 2 status for copper.

122.    On December 17, 2020, LKQ filed a Level 1 ERA Report for the Sun Valley Facility. This violated the General Permit by incorrectly claiming that the Sun Valley Facility was in Level 1 status for copper, when in actuality, it remained the Facility remained in Level 2 status as a result of the fact that LKQ had not sampled four consecutive QSEs showing no NAL exceedances for copper. In addition, this report violated the General Permit because, even if the Sun Valley Facility had returned to baseline for copper previously, LKQ's NAL exceedance for copper in the 2019-2020 reporting period meant that LKQ's Sun Valley Facility returned directly to Level 2 status with respect to copper (not Level 1 status as LKQ claimed), as of July 1, 2020. *See* General Permit § XII.D.4.a. (after discussing return to baseline status, stating: "If future NAL exceedances occur for the same

parameter(s), the Discharger's Baseline status will return to Level 2 status on July 1 in the subsequent reporting year during which the NAL exceedance(s) occurred."). For this reason, LKQ also violated the General Permit by failing to file the required Level 2 ERA Action Plan for the Sun Valley Facility with respect to copper by January 1, 2021. In addition, LKQ violated the General Permit by failing to submit the required Level 2 ERA Technical Report by January 1, 2022 with respect to copper.

123.   Even if the Sun Valley Facility were in Level 1 status for copper, LKQ violated the General Permit by failing to complete the ERA Level 1 Evaluation by October 1, 2020. *See* General Permit § XII.C.1. Instead, the Level 1 ERA Report states that the Evaluation was conducted on October 29, 2020.

124.   On December 30, 2020, Regional Board staff conducted a site inspection of the Sun Valley Facility to follow up on a complaint forwarded from the California Environmental Protection Agency. As noted above, the inspection report reveals that an LKQ employee pushed thousands of gallons of oily water onto a public street.

125.   A follow up inspection from the City of Los Angeles issued LKQ's manager a misdemeanor citation for this violation. In a follow up conversation with Mr. Daniel McIntyre, the Environmental Compliance Manager for the Sun Valley Facility, and the Facility's Qualified Industrial Storm Water Practitioner (QISP), Mr. McIntyre stated "the manager in charge at the time that the unauthorized discharge occurred was new at his position and was not properly trained." As such, LKQ has failed to properly train and manage LKQ's personnel, and establish adequate quality assurance and record keeping procedures, in violation of the General Permit. *See* General Permit § X.H.1.f (requiring LKQ to implement the minimum BMP of an Employee Training Program); *id*. at X.H.1.g (requiring LKQ to implement

management procedures to ensure that appropriate staff implements all elements of the SWPPP and MIP, develops a method to track implementation of BMPs, and maintain implementation, training, and spill-related records); *id*. at IX.A. (requiring training of appropriate team members). Moreover, each Site Map revision that LKQ has made since May 20, 2020 has violated the General Permit by failing to identify the location where this significant spill occurred. *See id*. at X.E.3.e. In addition, each SWPPP revision LKQ has made since this date has violated the General Permit by: failing to evaluate this area as an area where spills or leaks can likely occur; failing to ensure that the SWPPP includes: a list of the spilled industrial materials as part of the list of industrial materials that have spilled or leaked in significant quantities and have discharged, or had the potential to be discharged, from the Facility's storm water conveyance system within the previous five-year period; and a list of the toxic chemicals identified in 40 C.F.R. § 302, or oil and hazardous substances in excess of reportable quantities (40 C.F.R. §§ 110, 117, and 302) that have discharged from the Facility's storm water conveyance system within the previous five-year period; and failing to ensure that for each discharge or potential discharge, the SWPPP includes the location, characteristics, and approximate quantity of the materials spilled or leaked, and all other required information. *See id*. at X.G.1.d.

126.    LKQ's SWPPPs are also inadequate because they fail to discuss tracking of particulates (dust, grit, and so forth) out of the Wilmington and Sun Valley Facilities; fail to include BMPs to address tracking; and lack the requisite training procedures description required under the General Permit. In addition, all discharge points are not sampled as required.

127.    As discussed above, LKQ's SWPPP for each Facility does not specify adequate BMPs designed to reduce pollutant discharge to BAT and BCT levels in accord with § X.A-I of the General Permit, as evidenced by the Facilities' continued

discharges of stormwater contaminated above pollutant levels attainable via application of BAT and BCT.

## VI.   CLAIMS

### FIRST CLAIM FOR RELIEF

**Discharges in Violation of Technology-Based Effluent Limitations**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

128.   Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

129.   As described above, and as reflected in Attachment 1, the Facilities have repeatedly discharged stormwater from the discharge locations ("outfalls") identified in LKQ's SWPPPs containing pollutant levels exceeding applicable Benchmark Values and NALs. Furthermore, at other LKQ automotive dismantling facilities like the Facilities, LKQ has adopted advanced BMPs that it has failed to adopt these Facilities. As such, the Facilities have discharged pollutants above a level commensurate with application of BAT and BCT. Attachment 1 compiles some of the self-monitoring data reported by the Facilities to the Regional Board reflecting the Facilities' sampling of actual stormwater discharges. The sample results reflected in Attachment 1 are representative of the pollutant levels in the Facilities' discharge of stormwater. Thus, every instance when the Facilities have discharged stormwater, including instances when the Facilities have discharged stormwater that it has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Attachment 1.

130.   Each day that LKQ discharged stormwater from the Facilities, its stormwater contained levels of pollutants similar to the levels reported in Attachment 1, thus constituting the discharge of pollutants in the absence of applicable of BAT/BCT levels of control, in violation of the CWA's and General Permit's technology-based effluent limitations.

131.   Los Angeles Waterkeeper further alleges that on each day that LKQ has discharged stormwater, LKQ has discharged stormwater that was not treated to a level commensurate with BAT or BCT in violation of the Effluent Limitations of the General Permit, section V.A., because, as alleged above, LKQ has failed to comply with numerous other requirements of the General Permit, including those relating to implementation of the Exceedance Response Action process and developing (and updating) SWPPPs that meet the requirements of the General Permit, which are designed to ensure that LKQ's BMPs are commensurate with BAT and BCT for the Facilities.

132.   Los Angeles Waterkeeper further alleges that on each day of rainfall at the Wilmington Facility and the Sun Valley Facility, as identified in Attachment 3, LKQ has caused stormwater discharge that was not treated to a level commensurate with BAT or BCT in violation of the Effluent Limitations of the General Permit, section V.A., because LKQ has tracked pollutants from the Wilmington Facility and the Sun Valley Facility onto the public streets adjoining the Facilities and caused these pollutants to be discharged during rain storms via runoff into the MS4 drop inlets located on these public streets. Pollutants conveyed into the MS4 in this fashion are in turn discharged to the Dominguez Channel, the Los Angeles Harbor, and all downstream areas (with respect to the Wilmington Facility) and to the Tujunga Wash, the Los Angeles River, and all downstream areas (with respect to the Sun Valley Facility).

133.   While LKQ should be aware of each day that it has discharged stormwater from the Facilities (as the General Permit requires LKQ to monitor such discharges), since LKQ began industrial operations at the Facilities, it has discharged stormwater containing pollutants from the Facilities to the Dominguez Channel, the Tujunga Wash, the Los Angeles River, the Los Angeles Harbor, San

Pedro Bay, and the Pacific Ocean during at least every significant local rain event over 0.1 inches. Significant local rain events are reflected in the rain gauge data available at https://www.ncdc.noaa.gov/cdo-web/search. Attached as Attachment 3 are tables reflecting the rainfall data since November 11, 2016 as reported at the TORRANCE AIRPORT, CA US monitoring station (with respect to the Wilmington Facility) and as reported at the BURBANK GLENDALE PASADENA AIRPORT, CA US monitoring station (with respect to the Sun Valley Facility) from the National Oceanic and Atmospheric Administration's National Centers for Environmental Information website.

134.    LKQ's unlawful discharges of stormwater from the Facilities with levels of pollutants exceeding BAT and BCT levels of control continue to occur during all significant rain events. Each discharge of stormwater from the Facilities after the effective date of the BAT and BCT requirements constitutes a separate violation of the General Permit and the CWA. LKQ is subject to civil penalties for violations of the General Permit and the CWA within the five (5) years preceding the November 11, 2021 notice letter.

## SECOND CLAIM FOR RELIEF

**Discharges of in Violation of Water Quality-Based Effluent Limitations (Violations of 33 U.S.C. §§ 1311, 1342)**

135.    Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

136.    As set forth above, the General Permit contains water quality-based effluent limitations that prohibit a facility from discharging pollutants at a level that: causes or contributes to an exceedance of any applicable Water Quality Standard; adversely affects human health or the environment; or threatens to cause pollution or a public nuisance. General Permit § VI.A-C. As set forth above, LKQ's discharges of stormwater from the Wilmington and the Sun Valley Facilities have caused or

1   contributed to an exceedance of one or more of the above-listed Water Quality
2   Standards.

3   137.   In addition, as set forth above, LKQ's discharges have threatened to
4   cause pollution, contamination, or nuisance, and have adversely affected human
5   health or the environment, in violation of the water quality-based effluent limitations
6   of the General Permit sections VI.B-C and VII.B.

7   138.   In addition, LKQ's discharges have caused the Dominguez Channel
8   Estuary, the Los Angeles / Long Beach Harbor, the Tujunga Wash, the Los Angeles
9   River, San Pedro Bay, and the Pacific Ocean to fail to meet one or more of the
10  designated beneficial uses for these waters established in the Basin Plan, in violation
11  of the water quality-based effluent limitations of the General Permit. *See id*. at VI.A
12  and VII.B.

13  139.   In addition, LKQ's discharges have caused the Dominguez Channel
14  Estuary, the Los Angeles / Long Beach Harbor, the Tujunga Wash, the Los Angeles
15  River, and all other 303(d)-listed receiving waters noted above, to not attain or
16  contributed to these waters not attaining one or more applicable Water Quality
17  Standards in violation of the water quality-based effluent limitations of the General
18  Permit. *See id*. at VI.A and VII.B.

19  140.   Each day that LKQ has discharged stormwater from the Facilities, its
20  stormwater has contained levels of pollutants matching the levels set forth in
21  Attachment 1, and thus caused levels of pollutants to exceed one or more of the
22  applicable water quality-based effluent limitations referenced above. Since the
23  effective date of the above-referenced water quality-based effluent limitations, LKQ
24  has discharged stormwater from the Facilities during at least every significant local
25  rain event over 0.1 inches in a manner that has caused or contributed to water
26  quality-based effluent limitations not being met. *See* Attachment 3.

27
28

141.     LKQ's unlawful discharges from the Facilities continue to occur during all significant rain events. Each discharge from LKQ's Facilities that causes or contributes to an exceedance of an applicable water quality-based effluent limitation constitutes a separate violation of the General Permit and the CWA. LKQ is subject to civil penalties for violations of the General Permit and the CWA within the five (5) years preceding the November 11, 2021 notice letter.

## THIRD CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate Stormwater Pollution Prevention Plan**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

142.     Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

143.     LKQ has failed to develop and implement an adequate SWPPP for the Facilities that meets the requirements of the General Permit. *See* General Permit § X.

144.     As set forth above, LKQ's SWPPPs for each Facility have been incomplete, inaccurate, and inadequate in numerous ways under General Permit section X, including by: failing to identify minimum and advanced BMPs necessary to reduce the Facilities' pollutant discharges to a level commensurate with BAT/BCT levels of control (including BMPs that LKQ has implemented at other automotive dismantling facilities); making incorrect designations as to the Facilities' ERA Level status; failing to require sampling for all required parameters; failing to incorporate the requisite information following spills and leaks at the Facilities; failing to update the Facilities' site maps with the spill and leak locations; and failing to discuss tracking of particulates (dust, grit, and the like) from the Facilities, to identify BMPs related to tracking, and to incorporate the requisite training procedures descriptions relating to tracking. In addition, as set forth above, LKQ has failed to submit revisions to its SWPPPs within the required three months (or within

30 days for significant revisions). *See* General Permit § X.B.2-3.

145.     Moreover, LKQ has failed to comply with, or adequately implement, its SWPPPs at the Facilities by: failing to sample all discharge locations identified for sampling in the SWPPPs; failing to comply with the BMPs required by the SWPPPs; failing to comply with the training, quality control, and recordkeeping requirements of the SWPPPs; failing to obtain the requisite number of stormwater samples each reporting year; failing to have the samples analyzed for all required parameters; and otherwise as set forth above. Such violations constitute a violation of its SWPPP and also a violation of LKQ's obligations in the General Permit to implement its SWPPP. *See* General Permit § X.A.

146.     LKQ's stormwater discharges in excess of benchmarks and NALs is further evidence that it has failed to prepare, maintain, revise, and implement its SWPPP as required.

147.     LKQ has been in daily and continuous violation of the requirement to develop and implement an adequate SWPPP for each Facility since commencing operations at the Facilities. LKQ will continue to be in violation every day that it fails to develop and implement an adequate SWPPP. LKQ is subject to civil penalties for violations of the General Permit and the CWA occurring within the past five (5) years preceding the November 11, 2021 notice letter.

## FOURTH CLAIM FOR RELIEF

### Violations of Monitoring and Reporting Requirements
### (Violations of 33 U.S.C. §§ 1311, 1342)

148.     Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

149.     Under the General Permit, dischargers are required to prepare and implement an MIP as part of their SWPPP, and to comply with specific sampling,

monitoring, and reporting requirements. *See* General Permit §§ X.I, XI. The MIP requirements in the General Permit specify visual observation procedures, sampling procedures, locations, and other methods that dischargers must comply with.

150.    As set forth above, LKQ's MIP is inadequate to comply with the General Permit, as evidenced by: LKQ's ongoing stormwater discharges in excess of benchmarks and NALs; and the Regional Board Notice of Violation, criminal citations, adverse inspection reports, and complaints regarding the condition and stormwater management at the Facilities.

151.    In addition, LKQ has failed to adequately implement the MIP and failed to comply with other monitoring and reporting requirements of the General Permit, as set forth above. LKQ has violated its MIP and the General Permit by failing to adequately monitor and report on stormwater discharges during rain events, including by: failing to take the requisite number of samples each reporting year; failing to sample each outfall specified for sampling in the MIP and SWPPP; and failing to have each sample analyzed for all required parameters. In each instance when LKQ filed its annual report and contended that it lacked the ability to conduct the requisite number of storm water samples due to the lack of adequate rainfall, such reports were false because there were sufficient rain events to conduct the requisite number of samples.

152.    In addition, as set forth above, LKQ has violated the MIP and the monitoring and reporting requirements of the General Permit by: failing to properly train and manage its personnel; and failing to establish adequate quality assurance and record keeping procedures.

153.    LKQ has been in daily and continuous violation of the requirement to develop and implement an adequate MIP and to comply with the monitoring and reporting requirements of the General Permit for each Facility since commencing

operations at the Facilities. LKQ will continue to be in violation every day that it fails to develop and implement an adequate MIP and to comply with the monitoring and reporting requirements of the General Permit. LKQ is subject to civil penalties for violations of the General Permit and the CWA occurring within the past five (5) years preceding the November 11, 2021 notice letter.

### FIFTH CLAIM FOR RELIEF

**Violations of Exceedance Response Action Requirements**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

1.     Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

2.     As set forth above, LKQ has failed to comply with the requirements of the Exceedance Response Action process under the General Permit. LKQ has violated these requirements by failing to submit all required ERA reports and filings (including Level 1 ERA Evaluations, Level 1 ERA Reports, Level 2 Action Plans, Level 2 Technical Reports, and failing to update the Level 2 Technical Reports annually) within the time periods required by the General Permit, including by failing to submit required reports entirely, and by failing to submit them on time.

3.     In addition, LKQ has violated the Exceedance Response Action requirements by submitting inaccurate and inadequate Exceedance Response Action reports and filings as detailed above, including reports and filings that failed to: identify all pollutant sources; include the required schedule and detailed description of the tasks required to complete LKQ's selected demonstration(s); inaccurately claimed parameters had returned to Level 1 status or baseline status; failed to accurately identify all parameters in Level 1 or Level 2 status; contained inaccurate "NAL Exceedance Summary" information; and failed to call for the implementation of BAT/BCT levels of control.

4.      LKQ's ongoing stormwater discharges in excess of benchmarks and NALs is further evidence of its failure to comply with the requirements of the Exceedance Response Action process.

5.      LKQ has been in daily and continuous violation of the Exceedance Response Action requirements of the General Permit for each Facility since commencing operations at the Facilities. LKQ will continue to be in violation every day that it fails to comply with the Exceedance Response Action requirements of the General Permit. LKQ is subject to civil penalties for violations of the General Permit and the CWA occurring within the past five (5) years preceding the November 11, 2021 notice letter.

## VII.    RELIEF REQUESTED

154.    Wherefore, Los Angeles Waterkeeper respectfully requests this Court to grant the following relief:

a.      Declare LKQ to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from the Facilities in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and procedural requirements of the General Permit and the CWA;

b.      Enjoin LKQ from discharging pollutants from its Facilities to the Dominguez Channel, the Tujunga Wash, the Los Angeles River, the Los Angeles Harbor, San Pedro Bay, and the Pacific Ocean.

c.      Enjoin LKQ to restore all receiving waters damaged by its illegal discharges of pollutants from the Facilities;

d.      Enjoin LKQ from violating the substantive and procedural requirements of the General Permit at the Facilities;

e.      Order LKQ to pay civil penalties of $56,460 per day per violation for

violations occurring after November 2, 2015 and assessed on or after December 23, 2020. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (EPA regulation adjusting the CWA's statutory civil penalties for inflation).

   f.      Award Plaintiff its costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA, 33 U.S.C. § 1365(d); and

   g.      Award such other relief as this Court may deem appropriate.


Dated: January 19, 2022                    ENVIRONMENTAL ADVOCATES


                                           Christopher a. Sproul
                                           _____
                                           Christopher Sproul
                                           Environmental Advocates
                                           Attorneys for Plaintiff
                                           LOS ANGELES WATERKEEPER